2007 UT 70

**STATE of Utah, Plaintiff
and Respondent,**

v.

**Randy Shea GARDNER, Defendant
and Petitioner.**

No. 20060281.

Supreme Court of Utah.

Aug. 28, 2007.

Mark L. Shurtleff, Att'y Gen., Kenneth A. Bronston, Asst. Att'y Gen., James M. Cope, Salt Lake City, for plaintiff.

Margaret P. Lindsay, Julia Thomas, Orem, Patrick V. Lindsay, Provo, for defendant.

NEHRING, Justice:

## INTRODUCTION

¶1 Randy Shea Gardner attempted to smuggle illegal drugs into the prison facility where he was an inmate. He was convicted of distributing, offering, agreeing, consenting, or arranging to distribute methamphetamine and was sentenced to serve a one-to-fifteen-year prison term, to begin after the prison term he was then serving expired. He challenges that conviction in this appeal. He claims that he was not guilty of the crime because a police informant and an undercover police officer entrapped him.

¶2 After he was sentenced, Mr. Gardner appealed. He sought summary reversal of his conviction because the cross-examination testimony of one of the prosecution's key witnesses, Leland Clark, was missing from the record, apparently due to a recording malfunction. Mr. Clark was a prison inmate turned informant who assisted Mr. Gardner with his efforts to bring drugs into the pris-

on. Mr. Gardner argued that the cross-examination of Mr. Clark was key to the success of his entrapment defense and that without it he could not receive a constitutionally adequate appeal. The State countered with a motion to remand to reconstruct the record, which the court of appeals granted after denying Mr. Gardner's motion.

¶3 After the trial court conducted a hearing and reconstructed the record, the appeal returned to the court of appeals. The court of appeals decided the appeal without referring to the reconstructed record, holding that it did not need to consider Mr. Clark's reconstructed cross-examination testimony because it was, at best, impeachment evidence and irrelevant to an appeal based on a challenge to the sufficiency of the evidence.

¶4 We agree with the court of appeals that when evidence that is allegedly missing from an incomplete record is impeachment evidence rather than substantive evidence, it is appropriate for an appellate court to decide the case without reference to the reconstructed record. Under these circumstances, appellate courts may rely on the presumption that the jury properly took into account conflicting evidence and believed the evidence that supported the verdict. Accordingly, we affirm Mr. Gardner's conviction.

## BACKGROUND

¶5 Mr. Gardner and Mr. Clark became friends while they occupied adjoining cells and shared the same recreation schedule at the Uintah maximum-security facility of the Utah State Prison. According to Mr. Clark's direct trial testimony, Mr. Gardner told Mr. Clark that his friend "Don" (Donald Buckley, Jr.), a medical technician at the Uintah facility, had delivered unprescribed prescription pain medicine to him several times and that the arrangement presented "a good opportunity to make some money."[1] Mr. Gardner suggested, however, that he did not have anyone to supply illegal narcotics and that the medical technician who had delivered the unprescribed pain medications probably would not do it.

---

1. Mr. Buckley regularly delivered prescribed medications to the inmates of the Uintah facility

in blister packs or "little brown envelope[s]" incident to his duties at the Utah State Prison.

¶6 Mr. Clark relayed this information to Kevin Pepper, an investigator for the Department of Corrections, who had an office in the Uintah facility. Mr. Clark and Mr. Pepper had known each other since August 2000, when Mr. Pepper had transported Mr. Clark back to Utah from California. Mr. Pepper directed Mr. Clark to "keep his eyes and ears open" and to further investigate the situation. Mr. Clark had reason to cooperate with prison officials because he wanted to "compact" (transfer) to a prison facility outside of Utah. To this end, he asked Mr. Pepper to pen a letter to the Board of Pardons touting Mr. Clark's cooperation if the investigation was successfully completed.[2] Mr. Pepper then verified that medical technician Donald Buckley was on Mr. Gardner's visiting and telephone lists and that Mr. Buckley had received several calls from Mr. Gardner in the months preceding Mr. Clark's conversation with Mr. Gardner.

¶7 When Mr. Clark and Mr. Pepper met again, Mr. Clark relayed that "he had discussed it with [Mr. Gardner] and [Mr. Gardner] wanted to hook up and get a deal going." Mr. Pepper told Mr. Clark to inform Mr. Gardner that he had a source by the name of "Kevin Gilmore" (Mr. Pepper's undercover alias) and to have Mr. Gardner call him using Mr. Clark's prisoner PIN number. Mr. Pepper then officially registered Mr. Clark as a confidential informant.

¶8 Later, Mr. Pepper and Mr. Clark had a brief telephone conversation. Mr. Pepper reminded Mr. Clark to have Mr. Gardner contact him. Mr. Pepper also requested a mail cover[3] on Mr. Gardner. Mr. Pepper intercepted a letter Mr. Gardner sent to Mr. Buckley in which Mr. Gardner wrote that he knew that Mr. Buckley had "a little [money] problem" and that he "knew a way to help solve that" which was "fairly safe."

¶9 Mr. Gardner then used Mr. Clark's PIN number to place a ten-minute recorded call to Mr. Pepper. Mr. Gardner, referring to himself as "Shea," directed Mr. Pepper to call Mr. Buckley, gave him Mr. Buckley's telephone number, and told Mr. Pepper to say, "Shea said to call." Mr. Pepper first mentioned the subject of drugs during that call. Mr. Pepper then asked whether specific quantities of "black" (slang for heroin) or "white" (slang for methamphetamine) would "move" in the prison, and Mr. Gardner indicated that he could "check around."

¶10 According to Mr. Clark's testimony, after Mr. Gardner used the number, he reported to Mr. Clark that he and the "supplier" (Mr. Pepper) had talked about getting "cocaine and heroin lined up." Mr. Clark reported that "[Mr. Gardner] was pretty excited about it" and that Mr. Gardner was going to try to enlist the medical technician, Mr. Buckley, to bring the drugs into the prison. Mr. Clark told Mr. Gardner that he would help sell the drugs within the prison and indicated that he wanted to make some money to defray his out-of-state transfer costs. Mr. Clark told Mr. Gardner that he thought it was important to recruit Mr. Buckley. Mr. Gardner mentioned that it might be hard to persuade Mr. Buckley to participate and that if Mr. Buckley did participate, he would likely do it only once.

¶11 Mr. Gardner sent Mr. Buckley a letter that gave Mr. Buckley the name and telephone number "for that guy I was talking to you about." Three days later, Mr. Gardner called Mr. Pepper, and Mr. Pepper indicated that he was hesitant to propose the plan to Mr. Buckley, unless Mr. Buckley already knew about it. Mr. Gardner said that Mr. Buckley should have received the letter he had sent a few days earlier. Mr. Gardner then called Mr. Buckley and, according to Mr. Buckley's testimony, told him that he wanted him "to bring a manila envelope into the prison after contacting this person in the letter." Later that afternoon, Mr. Gardner called Mr. Pepper and said, "I called to let you know that I just talked to [Mr. Buckley]." Having been assured by Mr. Gardner that Mr. Buckley had consented to participate in the plan, Mr. Pepper told Mr. Gardner that he would call Mr. Buckley.

**2.** Mr. Pepper initially responded that he would "take it up [his] chain of command." Following the investigation, however, Mr. Pepper agreed to write a favorable letter for Mr. Clark.

**3.** When an inmate is under mail cover, the prison investigator "covering" that inmate receives a copy of letters and envelopes the inmate sends or receives.

¶ 12 In his conversation with Mr. Pepper, Mr. Gardner said that he could "move" either "black" or "brown," which Mr. Pepper testified referred to types of heroin. That night, Mr. Buckley called Mr. Pepper, and when Mr. Pepper told him that he had methamphetamine and heroin to take into the prison, Mr. Buckley immediately refused to become involved. When Mr. Buckley later told Mr. Gardner that he had refused to bring drugs into the prison, Mr. Gardner said that "he understood and he'd take care of it."

¶ 13 Several days later, Mr. Clark called Mr. Pepper and informed him that the operation had been foiled because Mr. Pepper had been exposed as law enforcement.

¶ 14 Mr. Gardner asserted that he had not fully understood the scheme and, to the extent he had understood that drugs would be involved, that he had gone along with it only because he had been cautioned by Mr. Pepper "not to get his a—in a jam" and that he was afraid Mr. Clark and the source could arrange for him to be harmed in prison if he failed to participate. Mr. Clark conceded that he had actively encouraged Mr. Gardner to obtain the contraband, but he insisted that he had not coerced him.

¶ 15 Based on this account of events, the State of Utah charged Mr. Gardner with two counts of distributing, offering, agreeing, consenting, or arranging to distribute a controlled or counterfeit substance, one count for methamphetamine and another for heroin. The magistrate bound Mr. Gardner over for trial. Mr. Gardner filed a motion to dismiss based on an entrapment argument, which the trial court denied following an evidentiary hearing.

¶ 16 Mr. Gardner renewed his entrapment motion at the close of the State's case at his trial. He claimed that the trial court should reconsider the merits of his motion because the trial testimony had revealed more evidence to support his entrapment defense at trial than had been presented at the preliminary hearing. Mr. Gardner also moved for a directed verdict, claiming that the State failed to show an offer, agreement, consent, or arrangement to distribute drugs. The trial court denied both motions. A jury returned a verdict finding Mr. Gardner guilty.

¶ 17 Mr. Gardner moved the court of appeals to summarily reverse his conviction because Mr. Clark's cross-examination testimony did not appear in the record. Although he did not indicate what he believed the missing cross-examination testimony of Mr. Clark contained that would overcome the evidence leading the jury to convict him, Mr. Gardner claimed that the missing evidence created a constitutional defect mandating that his conviction be vacated. The State responded to Mr. Gardner's motion with a motion to remand for the purpose of reconstructing the missing portion of the record. The court of appeals denied the petitioner's motion and granted the State's motion.

¶ 18 On remand to the trial court, the parties reviewed the audiotapes of trial and confirmed that Mr. Clark's cross-examination, as well as a portion of the prosecution's redirect examination of him, did not appear in the record on appeal due to a recording malfunction. Defense counsel was unable to recall the exact content of his cross-examination of Mr. Clark, but he believed that he had elicited more evidence of entrapment at trial than he had at the initial entrapment hearing. He recalled that Mr. Clark's testimony clearly established that Mr. Clark had urged Mr. Gardner to make telephone calls in furtherance of the plan to bring drugs into the prison and that Mr. Clark had moved beyond mere persuasion and had coerced Mr. Gardner to participate in the drug importation plan.

¶ 19 The prosecutor asserted that the missing parts of the record could be adequately reconstructed from his notes of defense counsel's cross-examination of Mr. Clark at trial and the entrapment hearing. From his notes, the prosecutor prepared in some detail a recitation of Mr. Clark's cross-examination testimony. The prosecutor's account of that testimony conceded that Mr. Clark had presented some evidence that appeared to support Mr. Gardner's claim that he had been the victim of entrapment, including admissions that (1) Mr. Clark was aware of Mr. Buckley's financial distress; (2) Mr. Clark never saw Mr. Buckley bring any controlled substance into the prison; and (3) Mr.

Clark "urged [Mr.] Gardner to make the arrangements with the phone call and everything, but [Mr.] Gardner was excited about making some money." The trial court found that although the audiotape of Mr. Clark's cross-examination was not part of the record, the tape, the prosecutor's proposed statement, and Mr. Clark's testimony on direct examination at trial and cross-examination at the entrapment hearing constituted a satisfactory reconstruction of the record. The trial court also concluded that the incomplete record did not prejudice Mr. Gardner. The court of appeals subsequently affirmed Mr. Gardner's conviction without reviewing the reconstructed record, reasoning that the record was complete enough, even before the reconstruction, to conduct an adequate review of the sufficiency of the evidence. *State v. Gardner*, 2006 UT App 21U, para. 5, 2006 WL 181520.

## STANDARD OF REVIEW

¶ 20 On certiorari, we review de novo the decision of the court of appeals, not that of the trial court. *State v. Krukowski*, 2004 UT 94, ¶ 10, 100 P.3d 1222.

## DISCUSSION

¶ 21 Court records are vulnerable to mishap, though infrequent and unfortunate when it occurs. Despite profound advances in the technology, record keeping is still a human enterprise, which accounts for the presence, in our rules and cases, of procedures to follow when confronting a defect in a record. *See* Utah R.App. P. 11(h) ("If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated, the parties by stipulation, the trial court, or the appellate court, either before or after the record is transmitted, may direct that the omission or misstatement be corrected and if necessary that a supplemental record be certified and transmitted."); *see also Bawden & Assocs. v. Smith*, 646 P.2d 711, 713 (Utah 1982) (affirming that a district court appropriately modi-

fied the record in question to accurately reflect the proceedings below). Among the first tasks to be undertaken when a defect in a court record is discovered is one common to most potential calamities, natural or manmade: damage assessment.

¶ 22 Mr. Gardner insists that the gap in the trial record inflicted grievous damage to his due process rights. Mr. Clark's cross-examination testimony on the defense of entrapment, he urges, was of such power that it rendered insubstantial all of the State's evidence that Mr. Gardner was a willing participant in the drug smuggling plan. It is important to note that Mr. Gardner does not claim that the record that was preserved is bereft of sufficient evidence to permit a jury to conclude that Mr. Gardner was not entrapped. He instead argues that the State's evidence, while adequate to carry the day in the face of no opposition, was so overwhelmed by Mr. Clark's cross-examination testimony that it lost all of its probative force. Not even Mr. Gardner claimed, however, that Mr. Clark's cross-examination testimony amounted to a repudiation or recantation of any material portion of his direct testimony, a scenario that could cause substantial prejudice and merit close appellate scrutiny.

¶ 23 We generally assess as negligible the damage caused by missing testimony that contradicts other testimony or impeaches the credibility of witnesses. Testimony that contradicts and impeaches implies that some evidence was presented that was of sufficient substance to merit contradiction or impeachment. Thus, a challenge to sufficiency of the evidence founded on missing cross-examination testimony is inherently suspect. For this reason, the court of appeals properly concluded that it could conduct its review of the merits of Mr. Gardner's sufficiency of the evidence appeal without reference to the missing or reconstructed record.

¶ 24 An appellate court may overturn a criminal conviction for insufficiency of evidence only "when it is apparent that there is not sufficient competent evidence as to each element of the crime charged for the fact-finder to find, beyond a reasonable

doubt, that the defendant committed the crime." *State v. Boyd*, 2001 UT 30, ¶ 13, 25 P.3d 985 (internal quotation marks and citation omitted). When conducting a sufficiency of the evidence review, it is the duty of the reviewing appellate court to perform its "review in the context of the whole record, or at least that portion of the record to which its attention was drawn by the appellant's marshaling obligation or the appellee's response to the appellant's marshaled evidence." *See S.B.D. v. State (State ex rel. Z.D.)*, 2006 UT 54, ¶ 39, 147 P.3d 401. Of course, this duty presumes that an intact record exists. It is nevertheless appropriate in the face of a defective record for an appellate court to honor certain credible assumptions relating to the conduct of the trial, including the assumption that the jury believed evidence supporting its verdict and discounted conflicting evidence. *Boyd*, 2001 UT 30, ¶ 14, 25 P.3d 985.

¶ 25 It is therefore not an error to conduct a sufficiency of the evidence review when a piece of the record is missing. If an appellant's best case is that he elicited contradictory evidence that is missing from the record, as was the case here, then an appellate court can rely on the presumption that the jury disbelieved the evidence in conflict with the jury verdict and find that there is evidence sufficient to support the jury's findings.

¶ 26 We agree with the court of appeals that a sufficiency of the evidence inquiry ends if " 'there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made.' " *State v. Gardner*, 2006 UT App 21U, para. 6 (quoting *Boyd*, 2001 UT 30, ¶ 16, 25 P.3d 985). We further endorse the court of appeals' core determination that the record in this case, despite the missing cross-examination testimony, was "complete enough to determine that the State presented sufficient evidence for a jury to find that [Mr.] Gardner acted freely and voluntarily, and was not entrapped into committing the offense." *Id.* at para. 7.

¶ 27 As noted above, Mr. Gardner does not maintain that the record upon which the court of appeals relied was so barren of evidence of his guilt as to warrant reversal of his conviction. The record is indeed sufficient to lead a conscientious jury to conclude that Mr. Gardner was not entrapped. Mr. Clark testified on direct examination that Mr. Gardner had initiated the idea of smuggling drugs into the prison to earn some extra money. In his testimony on redirect examination, Mr. Clark explained that he "[did not] recall urging [Mr. Gardener to call the medical technician] the first time." Mr. Clark further testified, "I don't recall I ever urg[ed] him." Mr. Clark explained that Mr. Gardner "was always a hundred percent ready to go, pretty excited about [unintelligible] urging him." When asked how persuasive he had to be to convince Mr. Gardner that he had "a rich connection on the outside," Mr. Clark responded: "I didn't have to be. Mr. Gardner initiated this—this bringing drugs in to begin with.... He was looking for a connection on the streets—somebody to pick the dope up." Mr. Gardner's attorney did not conduct a recross-examination. Moreover, Mr. Pepper's testimony about his phone conversation with Mr. Gardner reflects that Mr. Gardner was not coerced into carrying out the plan to bring drugs into the prison.

## CONCLUSION

¶ 28 We hold that the court of appeals did not err in reviewing the case for sufficiency of the evidence without reference to the reconstructed record because the missing evidence was, at best, contradictory impeachment evidence, rather than substantive evidence. Accordingly, we affirm Mr. Gardner's conviction.

¶ 29 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.