2011 UT App 332

**STATE of Utah, Plaintiff and Appellee,**

v.

**Matthew GRAHAM, Defendant and Appellant.**

No. 20090478–CA.

Court of Appeals of Utah.

Sept. 29, 2011.

Margaret P. Lindsay, Douglas J. Thompson, and Michael S. Brown, Provo, for Appellant.

Mark L. Shurtleff and Christine F. Soltis, Salt Lake City, for Appellee.

Before Judges McHUGH, THORNE, and ROTH.

## OPINION

ROTH, Judge:

¶ 1 Matthew Graham challenges his convictions for terroristic threat, a second degree felony, *see* Utah Code Ann. § 76–5–107(1)(b)(i), (2)(a) (2008) (current version at *id.* § 76–5–107.3(1)(b)(i), (2)(a) (Supp. 2011)), and domestic violence in the presence of a child, a third degree felony, *see id.* § 76–5–109.1(2)(b), (3)(a) (2003) (current version at *id.* (Supp. 2011)). Specifically, Graham claims that he could not be convicted of felony terroristic threat because the sheriff's office does not constitute a "unit of government" or, in the alternative, that he is entitled to a lesser punishment because the sheriff's office is both a unit of government and an agency organized to respond to emergencies. He also contends that he could not be guilty of felony domestic violence in the presence of a child because he did not "use" a dangerous weapon. We affirm.

## BACKGROUND [1]

¶ 2 At approximately 10:00 a.m. on Thursday, January 31, 2008, forty to fifty officers from the Utah County Sheriff's Office, including members of its SWAT and hostage negotiation teams, as well as neighboring police and fire departments, responded to a report of domestic violence occurring at Graham's home in Eagle Mountain, Utah. The standoff that ensued lasted four to five hours before Graham surrendered.

### I. The Events Inside Graham's Home

¶ 3 Earlier that day, Graham and his wife (Wife) had gotten into an argument after Wife indicated that she was not feeling well enough to accommodate his sexual desires. Throughout the morning, Graham's frustration and anger escalated, and Wife was unable to "calm him down by talking." Because Graham had previously threatened to kill Wife and dispose of her body, Wife began to fear that he might actually seriously harm her or even end her life. As a result, she telephoned a friend to pick up their four children so that the children would not continue to be exposed to the argument or witness physical violence, if any occurred. Once Graham discovered that Wife had asked a friend to care for the children, he told Wife to call the friend back and tell her not to come because the "kids aren't going anywhere." Graham then ordered the children upstairs to clean the loft, which was used as a playroom; Wife went with them. The Grahams' daughter testified that by that point her mother was "[s]obbing, bawling" and her father was "in a rage."

¶ 4 In the loft, Wife sent a text message to the friend she had called to care for the children, in which she pleaded with her friend, "[F]ight [for] custody of my kids" "[w]hen [I']m gone." The friend, who had already begun driving to the Graham home, contacted a person she knew at the sheriff's office to have a deputy sent to the home. In the meantime, Wife went into the master bedroom to pack a change of clothing and some medicine for herself. She also wrote a

---

[1] "On appeal, we review the record facts in a light most favorable to the jury's verdict." *State* *v. Jeffs*, 2010 UT 49, ¶ 3, 243 P.3d 1250 (internal quotation marks omitted).

note to the children, expressing her love for them. She then called the friend and whispered, " 'Are you on your way?' " After the friend said that she was, Wife said, " 'I['ve] got to go. He's coming.' " Wife planned to have the friend take her children while she stayed with another friend. She testified that she was very afraid at this point because based on Graham's previous threat to "hurt [her] and dispose of [her] body" and his escalating anger, she feared, "[T]his might be the day that he actually hurts me."

¶ 5 Wife then returned to the loft. Graham came in a few minutes later with two handguns holstered on his belt. Although the Grahams' daughter testified that it was not unusual for her father to wear his guns, Wife testified that her husband had never before armed himself during an argument. Graham and Wife again argued over whether the children could leave the home, and Graham demanded that Wife contact the friend to "[t]ell her not to come or [Graham] would shoot her [ (the friend) ]." Wife then called the friend and begged her not to come. After Graham left the loft, Wife sent a text message to her church bishop, which read, "Please help me!" The bishop did not recognize the number, but he immediately called it back. According to the bishop, Wife answered in a whisper that she was in trouble, that Graham had his guns, and that he had ordered her "to kill herself and the children or that [he] would." The bishop asked if Wife was in immediate danger, and she said yes. Wife then hung up because Graham was returning. The bishop called 911.

¶ 6 Graham returned to the loft after having discovered the bag that Wife had packed. Graham became even more furious, raising his voice and throwing the bag. Three of the children retreated to the corner while one child attempted to protect Wife. Graham repeatedly told the children that their mother was going to kill herself, and he read them the note that she had written to them. As a result, the children began to cry and the eldest child became "hysterical."

¶ 7 At that point, law enforcement officers arrived at the home. Graham said, " 'Here we go,' " and walked down the stairs to answer the door. Because Graham considered the police to be "the enemy" and he was holding one gun in his hand and had another on his belt, Wife testified that she expected gunfire immediately. Consequently, she begged Graham "not to do it." Graham retorted, " 'This is what you wanted.' " Wife and the children hid in the corner of the loft while Graham opened the door.

## II. The Police Standoff

¶ 8 Deputy B.J. Eckles and Deputy Jared Nelson of the Utah County Sheriff's Office[2] responded to the Graham home after receiving a report of domestic violence by a person who was in possession of multiple guns, had military training, and was possibly suffering from post-traumatic stress disorder. They were also told that the man had threatened to kill his wife and possibly himself. In response to the officers' knock, Graham opened the door approximately twelve inches so that the officers could see only his head and his shoulder.

¶ 9 Deputy Eckles explained that they were responding to a report of domestic violence and asked Graham if they could enter the home. Graham responded "no" and told the officers to leave his property. Deputy Eckles testified that Graham was "very agitated," "volatile," and "angry" that officers were there. He then asked if Graham had something in his hand. Graham replied, " 'I do.' " When asked if it was a weapon, Graham answered, " 'That's for me to know and for you to find out.' " At that point, the officers drew their weapons but kept them in a "low ready position." Deputy Eckles then asked if he could speak to Wife. Graham called Wife to the door and told her that she could leave. Wife refused to leave without the children so Graham told her that the children could go as well. As Wife and the children prepared to go, they kept their eyes fixed on Graham's right hand. The children refused to make eye contact with their father, and they walked as far away as possible from him as they exited the front door. Wife described it as the "scariest walk of [her] life" because she was "afraid that [Graham]

**2.** Eagle Mountain contracted with the Utah County Sheriff's Office for police services.

would shut the door and pull the gun in [their] direction." Both officers testified that Wife and the children were crying and that their faces indicated that something had occurred inside the home. They described Wife as "terrified." Deputy Eckles escorted them off the property and into a nearby home. Wife told him that Graham had a gun in his hand and various other weapons inside the house. After Wife and the children had left the home, Graham came out onto the front porch with his hand behind his back and commanded the officers to " '[g]et off [his] property.' " Deputy Nelson backed away and took a position in the neighbor's yard, where he joined officers from the Utah County SWAT team who had formed a perimeter around the home.

¶ 10 A short while later, Lieutenant Neil Castleberry of the Utah County Sheriff's Office met several officers inside a nearby home where Wife and the children had been taken to receive a briefing on what had transpired. When Graham called Wife's cell phone, Lieutenant Castleberry answered the call.[3] Lieutenant Castleberry explained to Graham that the officers' goals were to "keep him ... and the community safe" and to "resolve the situation at the lowest level possible." When Graham indicated that he had not done anything wrong and that he wanted the officers to leave his property, Lieutenant Castleberry informed him that the officers "weren't going away because a crime [ (domestic violence) ] had been committed."[4] Lieutenant Castleberry explained that the officers would remain on the scene until Graham came out of the home without any weapons and spoke to them. At that point, Graham stated that he "had no intention to come out ..., that he felt that [the officers] being there was a threat to him and his property, ... and that ... [if he saw] any individual

that he felt posed a threat to him[, he] would ... take action to neutralize the threat." Graham also indicated that he had the "training and the means" to "neutralize the threat." Lieutenant Castleberry understood Graham's statements to mean that Graham would shoot any officer that he observed on his property. In subsequent calls, Graham made similar statements. Lieutenant Castleberry kept Wife's cell phone in order to stay in communication with Graham when he left the home for the on-scene command post.

¶ 11 At the command post, Lieutenant Castleberry briefed Lieutenant Walter Pershon, the Utah County SWAT commander. During this briefing, Graham called Lieutenant Castleberry again. Graham continued to insist that he had done nothing wrong and expressed increasing frustration that the officers had not left. He reiterated that he had military training and was "willing and able" to harm any officers he observed. Graham became "quite agitated" and demanded that the officers " '[j]ust leave [him] alone and go away' "; then he disconnected the call. Lieutenant Pershon, who was present during this call, testified that because he perceived the situation to be "escalating very rapidly" and because he felt "desperation" about the safety of his officers, he borrowed Wife's cell phone to call Graham. Lieutenant Pershon was not a negotiator, but he hoped to connect with Graham because he had similar military training and experience. Over the next hour, Graham and Lieutenant Pershon spoke five or six times. Lieutenant Pershon testified that Graham continued to threaten to take action against the officers for approximately ten minutes of the first call. Specifically, the lieutenant reported that Graham stated that he could see armed police officers in his backyard and that he was capable of " 'tak[ing] someone out at 700 yards.' "[5] Gra-

---

**3.** Audio recording equipment was not available, and no written reports detailing the specifics of the calls were made. Consequently, the account of what occurred during the negotiation discussions comes from the testimony of the three Utah County Sheriff's Officers who spoke with Graham.

**4.** It is undisputed that Graham was not at that time a restricted person for purposes of gun ownership, that all of his weapons were legal,

and that neither possession of nor arming oneself with a weapon inside one's home is unlawful. Nevertheless, based on the information they had at the time, the officers were appropriately concerned that a domestic violence offense had been committed.

**5.** During this time, approximately twenty-four SWAT team members and an unknown number of other police officers had taken up positions around Graham's home. Various officers testi-

ham continued to insist that the officers leave his property or he would hurt them. The lieutenant stated that these statements created "[n]o doubt in [his] mind that [Graham] had the potential ... [,] in his state of mind, [to] fire on [the] officers." Lieutenant Pershon further testified that he and Graham began to discuss possible options for resolving the situation and that Graham then became more reasonable. After that and in subsequent calls, Lieutenant Pershon felt that the situation began to de-escalate.

¶ 12 Graham and Lieutenant Pershon discussed "exit strategies," which would include Graham putting away his weapons and coming out of the home. Graham eventually settled on the idea that he wanted assurance that he would not be charged with any crimes. At this point, Lieutenant Pershon handed the negotiations over to Deputy Whitnie Tait, a member of the sheriff's office negotiation team. Deputy Tait testified at trial that she spoke with Graham numerous times during which he remained in control of his emotions but demanded that the officers leave his property and that he be provided with a letter assuring him that he would not be criminally charged. Deputy Tait's negotiations with Graham lasted two-and-one-half to three hours. The officers, in coordination with the county attorney, finally decided to provide Graham with such a letter, though it was a ruse used only because the officers could think of no other way to persuade Graham to surrender. Tait testified that she read the letter to Graham over the phone. Tait reported that after she read the letter, she heard movement from Graham and the sound of a gun magazine being ejected. Graham then left the home unarmed and was taken into custody.

### III. The Charges and Trial

¶ 13 Graham was charged by information with aggravated kidnapping or, in the alternative, with aggravated assault (domestic violence), felony terroristic threat, and felony domestic violence in the presence of a child. The jury found Graham guilty of the terroristic threat and domestic violence in the pres-

ence of a child charges and acquitted him of the other charges. Graham now appeals the convictions.

## ISSUES AND STANDARDS OF REVIEW

¶ 14 Graham first complains that the trial court erred in the pertinent jury instruction by defining the "unit of government" element of the terroristic threat statute to include "a police department or agency," thus including, in effect, the county sheriff's office. Questions of statutory interpretation are matters of law, which we review for correctness. *See State v. McNearney*, 2011 UT App 4, ¶ 5, 246 P.3d 532. We therefore review definitions of statutory phrases that are provided in jury instructions without deference to the trial court's interpretation. *See State v. Souza*, 846 P.2d 1313, 1316 (Utah Ct.App.1993).

¶ 15 Graham also challenges the sufficiency of the evidence to support his conviction for domestic violence in the presence of a child. In particular, Graham argues that "reasonable minds could not rationally have arrived at a verdict of guilty beyond a reasonable doubt" because he merely possessed the gun and possession of a dangerous weapon by itself does not constitute "use" as a matter of law. *See generally State v. Hales*, 2007 UT 14, ¶ 36, 152 P.3d 321 (stating that appellate courts will not vacate a conviction so long as there is evidence and reasonable inferences that can be made from that evidence to support it). Because Graham's claim of error is focused on the scope of the term "use" in the statute under which he was convicted, his challenge amounts to "a legal question of statutory interpretation, which we review for correctness." *See State v. Ireland*, 2006 UT 82, ¶ 6, 150 P.3d 532 (stating that the determination of whether a defendant's gesturing with his hand in his pocket constituted use of a dangerous weapon under the aggravated robbery statute was "a legal question of statutory interpretation, which we review for correctness" (internal quotation marks omitted)).

---

fied to being as close as twenty to thirty yards from the house, though it is not apparent from

the record whether any of the officers were actually on Graham's property.

## ANALYSIS

### I. Terroristic Threat

¶ 16 The terroristic threat statute in effect on January 31, 2008, provided, in relevant part,

(1) A person commits a terroristic threat if he threatens to commit any offense involving bodily injury, death, or substantial property damages, and:

. . . .

(b) *he acts with intent to:*

(i) intimidate or coerce a civilian population or to *influence or affect the conduct of a government or a unit of government;* [or]

(ii) *cause action of any nature by an official or volunteer agency organized to deal with emergencies;*

. . . .

(2)(a) A violation of Subsection . . . (1)(b)(i) is a second degree felony.

. . . .

(c) Any other violation of this section is a class B misdemeanor.

Utah Code Ann. § 76–5–107(1)(b)(i)–(ii), (2)(a), (c) (2008) (emphases added) (current version at *id.* § 76–5–107.3(1)(b)(i), (iii), (2) (Supp. 2011)). The trial court instructed the jury that a " '[g]overnment or unit of government' includes a police department or agency." Graham admits that his implicit threats to harm the officers constituted an offense under the terroristic threat statute and that his actions were directed at a police department, namely the sheriff's office, but disputes the trial court's determination that a police department constitutes a "unit of government." Alternatively, Graham asserts that the sheriff's office is both a "unit of government" and an "official . . . agency organized to deal with emergencies" and that because the actions necessary to constitute an offense are the same regardless of the entity, he is entitled to a conviction on the misdemeanor offense under the rule of lenity, "[t]he judicial doctrine holding that a court, in construing an ambiguous criminal statute that sets out multiple or inconsistent punishments, should resolve the ambiguity in favor of the more lenient punishment," *Black's Law Dictionary* 1449 (9th ed. 2009).[6]

¶ 17 The State does not dispute Graham's position that a "unit of government" may have an emergency response function but advocates an interpretation of the statute that takes into account not only the type of entity targeted by the threat but also the nature of the action the threat is intended to evoke. It argues that by considering together the identity of the targeted governmental body and what a defendant is demanding that it do, this court can reconcile any conflicts within the statutory language by "affording each provision a meaningful purpose and separating [a] convoluted statute[ ] with a meaningful distinction," *see State v. Jeffries,* 2009 UT 57, ¶ 9, 217 P.3d 265. The State asserts that, analyzed under this approach, the sheriff's office is a unit of government and Graham's threats were made to influence or affect its conduct. We agree, for the reasons discussed below, that certain of Graham's actions fell within the scope of the terroristic threat statute's felony proscription.

¶ 18 "Our goal when confronted with questions of statutory interpretation is to evince the true intent and purpose of the Legislature. It is axiomatic that the best evidence of legislative intent is the plain language of the statute itself." *Anderson v. Bell,* 2010 UT 47, ¶ 9, 234 P.3d 1147 (citation and internal quotation marks omitted). Thus, we will give effect to the ordinary meaning of the statutory language unless it is ambiguous. *See Jeffries,* 2009 UT 57, ¶ 7, 217 P.3d 265.

¶ 19 The terroristic threat statute identifies two types of entities that may be the

---

**6.** The State interprets Graham's opening brief as also raising an argument pursuant to *State v. Shondel,* 22 Utah 2d 343, 453 P.2d 146 (1969), which requires a defendant to be sentenced to the lesser penalty where two statutes criminalize the same conduct but punish it differently. Graham does not cite *Shondel* or provide any *Shondel*-based analysis in his opening brief, however, and therefore the application of this doctrine, if intended to be raised, is inadequately briefed. Because we conclude that Graham's actions constitute a felony terroristic threat and are qualitatively distinct from those required for a misdemeanor conviction, neither the rule of lenity nor the *Shondel* doctrine have application in any event.

target of a threat "to commit any offense involving bodily injury, death, or substantial property damages": "a government or a unit of government" and an "official or volunteer agency organized to deal with emergencies." Utah Code Ann. § 76-5-107(1)(b)(i)–(ii). It proscribes threats against "a unit of government" that are intended to "influence or affect the conduct" of the entity and threats against an "agency organized to deal with emergencies" intended to "cause action of any nature" by the agency. *Id.* The legislature has not defined any of these terms in section 76-5-107, or in any other relevant statutory provision, as far as we or the parties have been able to determine.[7] Thus, interpretation of the statute to ascertain the intended level of offense requires us to consider whether the sheriff's office falls into one or both of the two categories of governmental entity that the statute identifies and whether Graham's demands implicated the kind of activities protected from threat by either or both subsections. Because we initially determine that Graham's actions conceivably could amount to a crime under either the felony or the misdemeanor provision, we must also consider how the nature of the sheriff's office as an entity and the types of activity implicated by Graham's threats and demands interrelate in the context of the two subsections of the statute and their corresponding punishments. In the course of our analysis, we identify some inherent statutory ambiguities. The identification of certain of those ambiguities, however, serves the limited purpose of marking the pathway to our ultimate conclusion that at least some of Graham's demands unambiguously attempted to influence conduct of the sheriff's office in its role as a unit of government and therefore fell within the statute's felony proscription. We do not attempt to resolve all the identified ambiguities; rather, for purposes of appeal, we assume resolution of certain of them in Graham's favor. And the remaining unresolved ambiguities do not affect our ability to reach a conclusion on this aspect of Graham's appeal.

¶ 20 Our analysis begins with the nature of the entity targeted by the threat. A voluntary fire department, an entity whose principal purpose is to respond to emergencies, seems to be a quintessential example of a "volunteer agency organized to deal with emergencies," and an organized fire department may represent its "official" counterpart. When a threat is made to "cause action of any nature" by an agency like these, the terroristic threat statute seems unambiguous in confining the level of conviction to a class B misdemeanor. *See generally id.* § 76-5-107(1)(b)(ii).

¶ 21 A "unit of government," however, has broader responsibilities than do emergency response entities, including management of resources, maintenance of order and public peace, establishment and implementation of public policy goals, as well as many other functions in support of the public weal. Most governments also have an inherent responsibility to respond to the great variety of emergencies that inevitably arise within their jurisdictions, and in this sense most govern-

---

7. The "Making a False Alarm" statute contains similar language, but our appellate courts have not yet had an opportunity to interpret the language in that context either. *See generally* Utah Code Ann. § 76-9-105 (2008) ("A person is guilty of making a false alarm if he initiates or circulates a report or warning of any fire, impending bombing, or other crime or catastrophe, knowing that the report or warning is false or baseless and is likely to cause evacuation of any building, place of assembly, or facility of public transport, to cause public inconvenience or alarm or *action of any sort by any official or volunteer agency organized to deal with emergencies.*" (emphasis added)).

The only other statute that we could locate that includes both the "influence" the conduct of government and "cause action" by any agency organized to deal with emergencies language is from Texas. Under the Texas Penal Code, one is guilty of a class B misdemeanor terroristic threat if "he threatens to commit any offense involving violence to any person or property with intent to[ ] *cause a reaction of any type* to his threat *by an official or volunteer agency organized to deal with emergencies* " and a third degree felony terroristic threat if he makes such a threat to *"influence the conduct or activities of a branch or agency of the federal government, the state, or a political subdivision of the state."* Tex. Penal Code Ann. § 22.07(a)(1), (6), (b), (e) (Vernon, Westlaw through first called session of 82nd legislature) (emphases added). We have not located any Texas appellate court decisions interpreting this language.

mental units, whether state or local, can be said to have been "organized to deal with emergencies," Utah Code Ann. § 76–5–107(1)(b)(ii) (2008) (current version at *id.* § 76–5–107.3(1)(b)(iii) (Supp. 2011)). For example, local governments not only construct, maintain, and manage county and city resources and infrastructure, but they also exist to deal with emergencies great and small, such as flooding from broken water lines, fires, crimes in progress, or natural disasters. In many cases, such responses are effectuated through governmental agencies that may or may not have emergency response as their primary function, such as a city's water, health, fire, or police departments. The sheriff's office, while in some sense "organized to deal with emergencies," does so in the context of a number of broader, nonemergency government responsibilities.[8]

¶ 22 "The sheriff's office is an elective office of the county ... and is a co-ordinate office or branch of our county government." *Sheriff of Salt Lake Cnty. v. Board of Comm'rs of Salt Lake Cnty.*, 71 Utah 593, 268 P. 783, 785 (1928); *see also* Utah Code Ann. §§ 17–22–1 to –29 (2009) (setting forth the qualifications, powers, and functions of the county sheriff). The sheriff's responsibilities are statutorily prescribed and include emergency functions, such as "manag[ing] search and rescue services," and "extinguish[ing] fires occurring ... on public land within his county"; nonemergency duties, like maintaining the county jail, transporting prisoners to court, and serving process and notices; and tasks that can be classified as emergency or nonemergency, depending on the circumstances, such as "mak[ing] all lawful arrests," providing court security, and "preserv[ing] the peace."[9] *See* Utah Code Ann. § 17–22–2(1); *see also Sheriff of Salt Lake Cnty.*, 268 P. at 785. Also among the sheriff's mandated duties is the provision of law enforcement services to other public entities by contract, as the sheriff did for Eagle Mountain City at the time of this incident. *See generally* Utah Code Ann. § 17–22–2(1)(*o* ). The wide scope of responsibilities given to a sheriff's office means that it is not simply "an official ... agency organized to deal with emergencies," *see* Utah Code Ann. § 76–5–107(1)(b)(ii), but, as "a co-ordinate office or branch of ... county government," *see Sheriff of Salt Lake Cnty.*, 268 P. at 785, it is more broadly a "unit of government, *see* Utah Code Ann. § 76–5–107(1)(b)(i)."[10]

¶ 23 That said, the statutory language itself gives no discernable guidance as to whether the two categories of government entities it refers to are mutually exclusive for the statute's purposes or whether they can overlap. Common understanding of the terms suggests they might overlap in certain instances. *See generally Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (observing that under our plain language canon of construction, appellate courts construe "common, daily, nontechnical speech" in a statute "in accordance with the ordinary meaning such words would have to a reason-

---

8. Although officers responded from at least one municipal police department, the Utah County Sheriff's Office was the agency in charge of the response because the incident was occurring within its jurisdiction. Additionally, the sheriff's office conducted all of the interactions with Graham and was the primary target of his threats and demands. Consequently, our discussion focuses specifically on whether a sheriff's office, as opposed to police departments in general, is a unit of government under this statute.

9. "Preserving the peace" conceivably can involve both emergency and nonemergency functions. For example, responding to a crime in progress may amount to an emergency response, while patrolling of businesses or neighborhoods and providing school resource officers are part of a broader effort to keep the peace and avoid emergencies.

10. Such an interpretation is not incongruous with the interpretations of the phrase "unit of government" in other jurisdictions. The District of Columbia defines "[u]nit of government" in its "Anti–Terrorism Act of 2002" as including "[a]ny executive department or agency of the District of Columbia, including any independent agency, board, or commission." D.C.Code § 22–3152(11)(E) (Westlaw through July 2011). New York's terroristic threat statute, which does not define unit of government and contains the same level of generality as Utah's statute, *see* N.Y. Penal Law § 490.20(1) (McKinney, Westlaw through 2011 legislature), has applied the term more broadly to include public employees of a governmental department, specifically the Department of Social Services, *see People v. Jenner*, 39 A.D.3d 1083, 835 N.Y.S.2d 501, 504–05 (N.Y.App.Div.2007).

able person familiar with the usage and context of the language in question" (internal quotation marks omitted)). For one thing, a local government, such as a city or county, falls within a common legal definition of "agency" and a fortiori so can a "unit of government," such as the sheriff's office. *See generally Black's Law Dictionary* 72 (9th ed. 2009) (defining "local agency" as "[a] political subdivision of a state .... includ[ing] counties, cities, school districts, etc.").[11] As we have discussed, a significant responsibility of government units at virtually every level is emergency response, and the misdemeanor provision of the statute does not limit its scope to agencies organized "primarily" or "exclusively" for emergency response. While the juxtaposition of both "official" and "volunteer" in the description of the affected agencies might suggest that the "official" agencies share the kind of focus on emergency response as "volunteer" emergency groups (volunteer fire departments or search and rescue organizations, for instance), the suggestion does not appear sufficiently strong to dispel the inherent ambiguity of the terms in this context. Thus, the statute is ambiguous as to whether a threat against a unit of government, acting in response to an emergency, can fall within the scope of the misdemeanor provision of the terroristic threat statute. While there are further steps we might take in an attempt to resolve this ambiguity, for purposes of appeal, we will assume without deciding, that a "unit of government" can act as an "agency organized to deal with emergencies" if it is responding to a threat in its emergency capacity.

¶ 24 This assumption does not resolve the statutory puzzle in this case, however, due to the apparently coextensive nature of the activity that is protected by both the felony and misdemeanor provisions in the statute. The felony provision proscribes a threat intended to "influence or affect the conduct" of a governmental entity, while the threat addressed by the misdemeanor provision is one aimed at "caus[ing] action of any nature" by the targeted emergency responder. Utah Code Ann. § 76–5–107(1)(b)(i)–(ii). Common dictionary definitions do not suggest a ready distinction between these terms. For example, to "influence" is "to affect or alter the conduct, thought or character of by indirect or intangible means: sway" or "to have an effect on the condition or development of: ... modify," *Webster's Third New Int'l Dictionary* 1160 (1993), and "conduct" is defined as "the act, manner, or process of ... carrying forward (as a business, government, or war): management," *id.* at 473, while "cause" means to "bring into existence: make," *id.* at 356, and "action" is "[t]he process of doing something; conduct or behavior" or "[a] thing done," *Black's Law Dictionary* 32 (9th ed. 2009).[12] Based on their definitions and common usage, both "influence or affect the conduct" and "cause action of any nature" seem to encompass virtually any attempt to cause or affect a governmental entity's response to a threat. The terroristic threat statute is therefore also ambiguous as to whether a threat aimed at inducing some action or response by government, if made in the context of an emergency, can be intended to either "influence or affect the conduct of" a governmental unit or "cause action of any nature" by an agency formed to respond to

**11.** The term "governmental unit" is defined as including "[a] subdivision, *agency*, department, county, parish, municipality, or other unit of government of a country or a state." *Black's Law Dictionary* 765 (9th ed. 2009) (emphasis added).

**12.** Definitions from other sources further highlight the apparent convergence of meaning in these terms. For example, "influence" is also defined as the exercise of "the capacity or power ... to be a compelling force on or produce effects on the actions, behaviors, opinions, etc. of others," Random House, Inc., *Dictionary.com Unabridged,* available at http://dictionary.reference.com/browse/influence (last visited Sep-

tember 16, 2011), while "cause" means to "make ... happen," New Oxford American Dictionary (3d ed.), *OxfordDictionaries.com, available at* http://oxforddictionaries.com/definition/cause?region=51fus (last visited September 16, 2011). "Conduct" is "the action or manner of managing an activity or organization," New Oxford American Dictionary (3d ed.), *OxfordDictionaries.com, available at* http://oxforddictionaries.com/definition/conduct?region=us (last visited September 16, 2011), and "action" means "something done or performed; act; deed," Random House, Inc., *Dictionary.com Unabridged, available at* http://dictionary.reference.com/browse/action (last visited September 16, 2011).

emergencies, *see* Utah Code Ann. § 76–5–107(1)(b)(i)–(ii). Thus, the statute's description of the effect of the threat on the actions or decisions of the government unit or agency does not itself clearly differentiate between the kind of threat subject to a felony conviction and the kind subject to a misdemeanor conviction.

¶ 25 Nevertheless, the legislature has elected to attach disparate penalties to attempts to influence the conduct of governmental units when compared with simply causing action by an emergency response agency. *See* Utah Code Ann. § 76–5–107(2)(a), (c) (2008) (current version at *id.* § 76–5–107.3(2) (Supp. 2011)) (classifying a threat to influence the conduct of government as a second degree felony and a threat to cause action by an emergency agency as a class B misdemeanor). *Compare id.* § 76–3–203(2) (2008) (imposing a prison term of one to fifteen years for a second degree felony), *with id.* § 76–3–204(2) (punishing class B misdemeanors with a maximum prison term of six months). It thus seems reasonable to conclude that the greater penalty was reserved for threats aimed at something broader and more significant in terms of governmental functioning than the on-the-ground handling of the emergency itself. *See generally id.* § 76–1–106 (requiring provisions of the code to "be construed according to the fair import of their terms to promote justice and to effect the objects of the law and general purposes"); *id.* § 76–1–104(3) (including, as one of the purposes of the criminal code, the "[p]rescri[ption of] penalties which are proportionate to the seriousness of the offenses").

¶ 26 For this reason, it makes sense to charge as a misdemeanor, for example, a person's threat to set his house on fire unless the voluntary fire department stays off the property or parks the fire trucks around the corner. In this context, the threat only seeks action within the purview of the emergency response itself, that is, the tactical, on-the-ground decisions of how the agency will deal with this particular emergency. But when the object of a threat goes beyond the immediate tactical decisions of the emergency and is targeted at the kind of decisions that fall within the more expansive authority and responsibility of a "government or unit of government," then the threat moves over the line from misdemeanor to felony. While the line we limn remains somewhat imprecise, it nevertheless serves the canonical purpose of "affording each provision a meaningful purpose and separating convoluted statutes with a meaningful distinction," *see State v. Jeffries,* 2009 UT 57, ¶ 9, 217 P.3d 265. For purposes of this decision then, we accept, without deciding, the proposition that had Graham limited his demands to the sheriff's deputies staying off his property, he might only be subject to conviction for a class B misdemeanor.[13] We conclude, however, that Graham's actions went beyond merely interfering with the details of the sheriff's response and unambiguously involved the type of threat that is aimed at "influenc[ing] or affect[ing] the conduct of a government or unit of government," *see id.* § 76–5–107(1)(b)(i).

¶ 27 Here, Graham demanded, under the implicit threat of violence, that the officers entirely abandon their public responsibility by departing the scene without arresting him for any domestic violence crimes committed within the home or any criminal aspects of the armed stand-off and without ensuring that Graham was emotionally stable and no longer a potential threat to himself or the safety of his immediate family, the neighbors, or the broader community. As further assurance that there would be no

---

13. As we have already explained, we have reserved the question of whether a government or unit of government can even be classified as an "agency organized to deal with emergencies" for purposes of this statute and are simply accepting for purposes of appeal Graham's contention that the statute allows a governmental entity to be classified as both. It is worth keeping in mind, however, that any threat described by the statute (i.e., a threat "to commit any offense involving bodily injury, death, or substantial property damages," *see* Utah Code Ann. § 76–5–107(1) (2008) (current version at *id.* § 76–5–107.3 (Supp. 2011))) is likely to precipitate an emergency of some sort, and if every government action in response to that emergency were therefore deemed to fall within the scope of the misdemeanor provision, the felony provision would become virtually meaningless.

consequences for his actions, Graham maintained his threats until the sheriff's office (ultimately in cooperation with the county attorney's office) provided him with written verification that criminal charges would not be filed against him. By making this demand, Graham, in effect, required that the sheriff's office not forward the information on to the county attorney's office, where the prosecutors could fulfill their own role of determining the viability of criminal charges. Unlike demands that an agency simply keep emergency responders off the property, which may be characterized as an interference in the tactical details of a particular emergency response, Graham's demand that the sheriff's office simply end its response without resolving the ongoing emergency and provide a written commitment to forego any criminal prosecution for his actions amounts to a requirement that, in the face of Graham's threat, the officers entirely abdicate a fundamental governmental responsibility that implicates the safety of the immediate neighborhood and the community at large, as well as the community's confidence in the integrity of the sheriff's office as a law enforcement agency and, more broadly, the power of its government to enforce its laws. In doing this, Graham clearly went beyond an attempt to "cause action" in the context of the sheriff's immediate, on-the-ground tactical response to the emergency Graham had created into the broader realm of "the conduct of ... a unit of government," *see* Utah Code Ann. § 76–5–107(1)(b)(i)–(ii).[14] Thus, while the terroristic threat statute may have significant areas of ambiguity, it appears to be aimed at protecting the central responsibilities of government against coercion by violent threat through the imposition of a penalty of greater significance than the misdemeanor applicable to a threat intended simply to "cause action" by an "agency organized to deal with emergencies,"[15] *see id.* § 76–5–107(1)(b)(ii).

---

**14.** Even though the sheriff's office purported to agree to Graham's demands in the context of a tactical decision about how to negotiate in response to his threat and resolve the ensuing emergency, Graham's threats were made with the intent of influencing the sheriff's office (and ultimately the county prosecutor) to, in fact, simply walk away from the situation without resolving the immediate risk he posed and without filing any criminal charges. What Graham was seeking was actual assurance that the government would tie its hands in response to his threats. Such a threat is aimed at influencing or affecting the conduct of government, whether or not the government actually accedes to the threat or, as here, disarms it with a tactical ruse.

**15.** The New York decision of *People v. Jenner*, 39 A.D.3d 1083, 835 N.Y.S.2d 501 (N.Y.App.Div. 2007), provides an interesting parallel. There, the defendant had threatened to kill certain employees of the Department of Social Services (DSS) after they informed his girlfriend that pursuant to DSS policy, her minor son would not be returned to her as long as she allowed the defendant, a convicted sex offender, to reside with her. *See id.* at 503. The defendant was charged and convicted of making a terroristic threat. *See id.* at 504. In New York,

"[a] person is guilty of making a terroristic threat when with intent to ... influence the policy of a unit of government by intimidation or coercion, *or affect the conduct of a unit of government* by murder, assassination or kidnaping, he or she threatens to commit or cause to be committed a specified offense and thereby causes a reasonable expectation or fear of the imminent commission of such an offense." *Id.* (alteration and omission in original) (emphasis added) (quoting N.Y. Penal Law § 490.20(1) (McKinney, Westlaw through 2011 legislature)). Although the defendant argued that "his conduct was not what the Legislature had in mind when it enacted th[e] statute after the terroristic attacks of September 11, 2001, and he should not [therefore] be labeled a terrorist," the *Jenner* court upheld the defendant's conviction, stating that his threat "was intended to intimidate or coerce public employees to influence DSS's policy regarding contact between children and sex offenders" and the defendant's intention in making the threat was to interfere with this policy. *See id.* The Utah statute, while not including New York's policy-focused language, proscribes nearly identical threats. *Compare* Utah Code Ann. § 76–5–107(1)(b)(i) (2008) (criminalizing threats intended "to influence or affect the conduct of ... a unit of government"), *with* N.Y. Penal Law § 490.20(1) (proscribing threats intended to "affect the conduct of the unit of government"). Many states adopted similar language in creating anti-terrorism statutes following September 11, 2001, although we have located no cases where the pertinent language is interpreted. *See, e.g.,* Ark. Code Ann. § 5–54–203(a) (West, Westlaw through 2011 regular session) (prohibiting certain threats intended to "influence the policy of a government or a unit of government"); Kan. Stat. Ann. § 21–5421(a)(2)–(3) (West, Westlaw through 2010 regular session) (prohibiting certain acts intended to "influence government policy ... or affect the operation of any unit of government"); Mich. Comp. Laws

Under these circumstances, Graham's threats unambiguously fell within the scope of conduct the statute proscribed as a felony. Thus, we affirm Graham's conviction for felony terroristic threat.[16]

## II. Domestic Violence in the Presence of a Child

¶ 28 Graham also challenges his conviction for domestic violence in the presence of a child. A person is guilty of domestic violence in the presence of a child if he "uses a dangerous weapon ... against a cohabitant, in the presence of a child." Utah Code Ann. § 76–5–109.1(2)(b) (2003) (current version at *id.* (Supp. 2011)). Graham argues that his conviction must be reversed because "the State failed to prove *every* element of the offense of domestic violence in the presence of a child, a third-degree felony, to wit: that

he *used* a dangerous weapon." (Second emphasis added.) To support this contention, Graham asserts that the only information before the jury upon which it could have based a conclusion that he "used" a dangerous weapon was that he was *in possession* of two guns during the course of the events. According to Wife's own testimony, Graham never pointed a gun at her or the children. Wife also testified that Graham did not overtly threaten to shoot her or to otherwise use a gun against her. Graham argues that he therefore did not "use" a weapon as the statute requires because the plain meaning of the word "use" requires active employment of the firearm. At the very minimum, he asserts that "use" requires something more than mere possession—for instance an explicit threat, by word, action, or gesture.[17] Al-

§ 750.543b(a)(iii) (West, Westlaw through P.A. 2011, No. 132, of the 2011 regular session) (prohibiting certain acts intended to "influence or affect the conduct of government or a unit of government"); N.J. Stat. Ann. § 2C:38–2(a), (c) (West, Westlaw through 2011 legislation) (prohibiting certain acts or threats intended to "influence the policy or affect the conduct of government"). It is worth noting, however, that nothing in the legislative history indicates that Utah modeled its statute on a particular state's version.

**16.** In reaching this conclusion, we have made our best effort to interpret the statute in accordance with its plain meaning and the apparent legislative intent. Our analysis, however, suggests significant areas of ambiguity in the language of the statute that may pose commensurate difficulties in its application, especially when a unit of government responds in an emergency capacity. Moreover, the tools at the courts' disposal for resolving statutory ambiguity, such as the legislative history, are of limited assistance here. The 2002 floor debates, for example, focused on the purpose of the statute—to ensure that Utah has appropriate means for dealing with acts of terrorism, particularly with weapons of mass destruction, in the wake of the September 11, 2001 attacks—without any discussion on the meaning of the provisions at issue here. *See* Recording of Utah Senate Floor Debates, 54th Leg., 2002 Gen. Sess. (March 6, 2002); Recording of Utah House Floor Debates, 54th Leg., 2002 Gen. Sess. (March 5, 2002). In 2010, the statute was amended to separate ordinary threats of violence against individuals, aimed simply at causing fear of injury or death, from crimes of terrorism, i.e., threats against the public or governmental entities. *Compare* Utah Code Ann. § 76–5–107 (2008) (Terroristic threat), *with id.* § 76–5–107 & amend. notes (Supp. 2011) (Threat

of violence), *and id.* § 76–5–107.3 & amend. notes (Supp. 2011) (Threat of terrorism). The debates surrounding this amendment centered on why this change was desirable. *See* Recording of Utah Senate Floor Debates, 58th Leg., 2010 Gen. Sess. (March 11, 2010); Recording of Utah House Floor Debates, 58th Leg., 2010 Gen. Sess. (Feb. 19, 2010).

In light of the ambiguous nature of this statute, the legislature may wish to consider revisiting the statutory language to clarify the circumstances under which a threat described by the terroristic threat statute can be charged as either a felony or a misdemeanor. In addition, the legislature may want to take this opportunity to correct what appears to be an oversight in the current statute. While the prior version of the statute made a threat intended "to cause action of any nature by an official or volunteer agency organized to deal with emergencies" a class B misdemeanor, *see* Utah Code Ann. § 76–5–107(1)(b)(ii), (2)(c) (2008), the amended version prohibits the act but fails to attach any penalty to a violation, *see id.* § 76–5–107.3(1)(b)(iii), (2) (Supp. 2011).

**17.** At various points in his briefing, Graham attempts to raise an argument that he made in his motion for a new trial in the district court—the lack of an underlying crime that the firearms were "used" to commit. We do not reach the issue for two reasons. First, Graham seems to concede the existence of an underlying crime by admitting that he could have been convicted of misdemeanor domestic violence, which requires the commission of an act of domestic violence against a cohabitant, *see* Utah Code Ann. § 76–5–109.1(2)(c) (2003) (current version at *id.* (Supp. 2011)); *see also* Utah Code Ann. § 77–36–1(4) (Supp.2007) (defining "domestic violence" as

though, as a legal principle, we do not disagree with Graham that peaceful possession is not enough to constitute "use," whether his possession of the two firearms during the events that unfolded in this case went sufficiently beyond simple control to meet the requirement of the statute must be considered in the revealing light of all the circumstances.

¶ 29 In previous decisions, we have held that possession amounted to "use" where the facts of the case indicated that the presence of the weapon was intended to cause fear. For example, in *In re R.G.B.*, 597 P.2d 1333 (Utah 1979), the Utah Supreme Court affirmed the defendant's conviction for aggravated robbery despite the fact that the defendant had only lifted his shirt to reveal a handgun tucked into his pants because "it is not necessary that the State prove that the robber actually pointed a gun at the victim.... If merely exhibiting the gun creates fear in the victim, it constitutes 'use of a [dangerous weapon]' for that purpose." *Id.* at 1335. In *State v. Weisberg*, 2002 UT App 434, 62 P.3d 457, this court relied on the reasoning of *In re R.G.B.* to affirm a defendant's conviction for felony stalking where the defendant "used" a shotgun when he moved it from the front seat of his vehicle to the trunk under circumstances where it could reasonably be inferred that he both knew that the victim would likely observe his actions and intended that she be intimidated. *See id.* ¶¶ 10, 16–17. The defendant appealed, arguing that the trial court failed to instruct the jury that use of a dangerous weapon required " 'active employment' of the weapon." *See id.* ¶ 15. We held that a weapon is used "even if it [wa]s never actually pointed at the victim, so long as 'exhibiting the [weapon] creates fear in the victim.' " *Id.* ¶ 17 (quoting *In re R.G.B.*, 597 P.2d at 1335). We reasoned that the defendant created such fear when he parked his car outside the victim's office window, then "removed a pistol-grip shotgun from the passenger com-partment [of his car by] .... lift[ing] the shotgun ... with the pistol-grip in his right hand and the barrel in his left hand," and, while looking into the window, walked towards the building before turning to place the shotgun in his trunk. *See id.* ¶¶ 3, 9–10.

¶ 30 In evaluating the sufficiency of the evidence, an appellate court considers the evidence and the inferences that may reasonably be drawn from that evidence to determine whether there is a basis upon which a jury could find the defendant guilty beyond a reasonable doubt. *See State v. Pedersen*, 2010 UT App 38, ¶ 12, 227 P.3d 1264, *cert. denied*, 238 P.3d 443 (Utah 2010). "[A] sufficiency of the evidence inquiry ends if there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made." *State v. Gardner*, 2007 UT 70, ¶ 26, 167 P.3d 1074 (internal quotation marks omitted). The only question before us is whether there was a basis in the evidence for the jury to find that Graham "used" the firearms. In other words, we must decide whether there was sufficient evidence from which the jury could have concluded that he exhibited the weapons in a manner that caused fear in Wife. We conclude that there was.

¶ 31 Wife testified that she was very afraid of Graham because of his prior threats to "hurt [her] and dispose of [her] body." This fear intensified when she saw that Graham had armed himself with guns, something that she testified he had never done during an argument. A defense witness corroborated Wife's statements, testifying that although she had seen Graham with a gun previously, she had never seen him armed during an argument. Indeed, the bishop testified that Wife had told him that Graham had threatened to kill her and the children and that it was Wife's fear of imminent danger that caused him to immediately contact the police department. The officers who responded to the home also indicated that Wife appeared

---

"any criminal offense involving violence or physical harm or threat of violence or physical harm ..., when committed by one cohabitant against another," or the commission or attempted commission of several listed crimes, including assault) (current version at *id.* (Supp. 2011));

Utah Code Ann. § 78B–7–102(2)(a) (2008) (defining "cohabitant" to include a spouse). Second, he has not adequately briefed the issue, *see* Utah R.App. P. 24(a)(9) (requiring an appellant to include the reasoning and the legal authority for his or her position).

terrified when she left the house, like "something ha[d] happened in the house." And as she left the house, the officers saw her frightened gaze focused on the hand in which Graham held one of the guns behind his back. Moreover, even if the jury believed Wife's testimony at trial that Graham did not actually point a gun at her or make any express threats against her that day, he did threaten to shoot Wife's friend if she came to the home. The jury could have concluded that this threat, uttered in the midst of an escalating argument in which Graham had taken the unprecedented step of arming himself, along with his prior threat to kill her, caused Wife reasonably to fear that Graham would harm her with the guns he continued to carry throughout a prolonged and emotionally-charged ordeal. The jury could also have concluded that Graham intended to frighten her. Thus, the evidence was sufficient for the jury to find, under the circumstances, that "merely exhibiting the gun creat[ed] fear in the victim" and that Graham therefore used a dangerous weapon. *See generally In re R.G.B.*, 597 P.2d at 1335 (affirming the juvenile court's determination that the defendant used a dangerous weapon when he "merely exhibit[ed] the gun" because it "create[d] fear in the [robbery] victim").

¶ 32 The fact that the evidence may be in conflict does not undermine its sufficiency to support the finding. It is within the province of the jury, as the finder of fact, to make credibility determinations. *See Child v. Gonda*, 972 P.2d 425, 433 (Utah 1998); *see also State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288 (observing that appellate courts generally must accept the jury's credibility determinations). So long as the evidence supporting the jury's findings is not so "inconclusive or inherently improbable ... that reasonable minds must have entertained a reasonable doubt," we will affirm its verdict. *See Robbins*, 2009 UT 23, ¶ 14, 210 P.3d 288. Because we have determined that there was sufficient evidence for the jury to find that Graham used the gun, and none of the other elements are contested, we affirm the conviction for domestic violence in the presence of a child.

## CONCLUSION

¶ 33 Graham's threats to harm the officers responding to reports of domestic violence at his home were intended to influence or affect the conduct of government because they were targeted at the discretionary functions of government, namely the decisions about who, when, and how to charge with criminal offenses. Consequently, we uphold his conviction for felony terroristic threat. In addition, there was sufficient evidence from which the jury could conclude that Graham "used" a dangerous weapon against Wife in the presence of their children. Graham's conviction for domestic violence in the presence of a child is therefore affirmed.

¶ 34 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge and WILLIAM A. THORNE JR., Judge.